IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| QWEST CORPORATION, a Colorado Corporation,<br><br>    Plaintiff,<br><br><br><br>    vs.<br><br><br>THE PUBLIC SERVICE COMMISSION OF UTAH, a regulatory agency of the State of Utah; RICHARD M. CAMPBELL, CONSTANCE B. WHITE, and TED BOYER, in their official capacities as Commissioners of the Public Service Commission of Utah; AT&T COMMUNICATIONS OF THE MOUNTAIN STATES, INC.; and TCG UTAH,<br><br>    Defendants. | ORDER GRANTING QWEST'S MOTION FOR JUDGMENT ON APPEAL<br><br><br><br><br>Case No. 2:05CV00104 PGC |

This dispute stems from an arbitration decision by the Public Service Commission of Utah that Qwest Corporation must pay AT&T Communications of the Mountain States, Inc., for Qwest's proportionate use of a long distance facility called Private Line Transport Service ("PLTS"). Qwest leased the PLTS in question to AT&T based on rates established in a federal tariff. The court holds that the Commission's order violates the filed-rate doctrine because it

effectively enables AT&T to pay less than the tariff price for the PLTS facility.  The court therefore grants Qwest's motion for judgment on appeal.

I.      **Background Facts**

At the risk of vast oversimplification, telephone networks consist of a multitude of wires and switches.  Phone calls are possible because signals travel over wires and through switches between the caller's and recipient's phones.  With time, the industry has grown increasingly complex: Companies developed many kinds of wires and switches to increase efficiency.  Where previously only one phone company's network existed, some competitors have now built separate competing networks.  And other businesses entered the telephone service provider market as resellers — they lease the network of an existing company to avoid the large expense of constructing an independent network, yet still provide competition for consumers' benefit. The original phone company in a market is known as an incumbent local telephone company ("ILEC"); the newcomers are known as competitive local exchange companies ("CLEC").

Ten years ago, Congress passed the Federal Telecommunications Act of 1996.  This legislation, along with the accompanying Federal Communications Commission regulations, govern many aspects of the interactions between phone companies in the same markets.  The Act requires competing local companies to "interconnect" their networks so that customers of one company (such as Qwest) can place calls to, and receive calls from, customers of another (such as AT&T).[1]  The Act requires local competitors to negotiate the terms (such as cost sharing) of

---

[1]*See* 47 U.S.C. § 251(c)(2).

their interconnection agreement;[2] if negotiations fail, the parties "may petition a State commission to arbitrate any open issues."[3]

Many phone companies provide more than just local phone service — they also offer long distance telephone services so that their customers can call outside established local calling boundaries.  The wires and switches (or "facilities") upon which long distance phone calls travel are different from those for local calls.  And unlike the rates for local facilities — which are governed by the terms of the interconnection agreement — the rates at which ILECs lease or sell their long distance facilities to CLECs are governed by rates set forth in a tariff that the FCC approves.[4]

This dispute between Qwest and AT&T centers on one specific type of facility: a private line transport service.  PLTS facilities are long-distance facilities; the rates to purchase or lease PLTS facilities are therefore set by federal tariff.  AT&T has purchased PLTS facilities from Qwest at the price specified in Qwest's tariff.

PLTS facilities can handle a large amount of traffic; as a result, AT&T's PLTS facility often contains unused excess capacity.  When negotiating their most recent interconnection agreement, AT&T sought to take advantage of this excess PLTS capacity by having Qwest send — at AT&T's request — local calls over its PLTS facility.  While PLTS facilities are normally used only for long distance calls, Qwest agreed to send local calls over the PLTS whenever

---

[2]*Id.* § 252(a)(1).

[3]*Id.* § 252(b)(1).

[4]*See id.* § 203(a).

AT&T requested.  Negotiations foundered, however, when Qwest and AT&T tried to decide how (if at all) to share the costs for this arrangement.

To understand the cost dispute here, an understanding of typical cost-sharing agreements is needed.  Under the Act, local competing companies may interconnect their networks in a number of ways, each with a different cost structure.  For example, Qwest and AT&T could establish a "dedicated" network, meaning local calls between these two companies' customers only would be carried on this network.  If the parties established dedicated one-way networks, Qwest would send its customers' calls to AT&T using one facility and AT&T would send its customers' calls to Qwest on a separate parallel facility.  Each company would be responsible for the transport costs on its own network.  But if they established dedicated two-way networks, local calls would be transported between the two companies on the same facility.  In that case, Qwest and AT&T would each bear the cost of transport in proportion to the percentage of local calls that each sends to the other — in other words, the parties would owe each other reciprocal compensation for their "relative use" of the two-way transport facility.

Qwest and AT&T agree that the Act imposes this reciprocal compensation obligation for relative use of local calling facilities.  The dispute here is whether this obligation applies when Qwest sends (at AT&T's request) local calls over AT&T's PLTS line — a long distance facility purchased at a tariff rate.  AT&T claims that it does.  Qwest claims that it does not.

The parties submitted this dispute to arbitration, and the Public Service Commission of Utah sided with AT&T.  In its arbitration order, the Commission noted a tariff argument raised by Qwest, observing that Qwest argued "AT&T's effort to have Qwest pay reciprocal

compensation based on the proportionate use of the PLTS for the transport of local traffic represents AT&T's impermissible effort to have this Commission alter Qwest's tariff, which Qwest[] argues is beyond this Commission's authority."[5]  But the initial arbitration order, as far as the court can tell, does not specifically respond to this argument.

After the order was issued, Qwest moved for reconsideration — again pressing the tariff argument.  The Commission denied Qwest's motion, but this time responded to Qwest's tariff argument at length.  The Commission said:

> We agree with Qwest that there is language in Qwest's FCC filed tariff which Qwest contends precludes apportioning.  We have considerable pause on the continuing efficacy and substantive merit for Qwest's position when it is compared with the FCC's recent *TRO* determination, and underlying rationale, to remove restrictions on CLECs combining, mixing or otherwise using telecommunications service UNEs, with other services and functionalities, regardless of their source, as CLECs compete in telecommunications markets.[6]

The Commission then quoted from the FCC's *TRO* order, emphasizing language about competitive disadvantages that result to CLECs when ILECs refuse to route local traffic over long distance facilities (such as PLTS).[7]  The Commission continued:

> As we have noted, Qwest's federal tariff appears to preclude a "ratcheting" type of billing for a shared use facility.  We have not required that Qwest ratchet

---

[5]Arbitration Report and Order, *In re Petition of Qwest Corp. for Arbitration of Interconnection Rates, Terms, Conditions, and Related Arrangements with AT&T Comm. of the Mountain States, Inc. & TCG Utah*, Docket No. 04-049-09 (May 20, 2004), at 16 [hereinafter "Arbitration Order"].

[6]Order Denying Mot. for Reconsideration, *In re Petition of Qwest Corp. for Arbitration of Interconnection Rates, Terms, Conditions, and Related Arrangements with AT&T Comm. of the Mountain States, Inc. & TCG Utah*, Docket No. 04-049-09 (June 28, 2004), at 6–7 [hereinafter "Reconsideration Order"].

[7]*See* Reconsideration Order, *supra* note 5, at 7.

its charges to AT&T; we did not prevent Qwest from charging AT&T the existing, unaltered, unblended PLTS rate.  In light of the FCC's rationale and determination that it no longer permits incumbent local exchange carriers' policies or practices to force competitive carriers to undertake inefficient network uses or architectures by requiring duplicative network facilities or precluding efficient use of idle network facilities, Qwest's argument concerning tariff language, which hinders AT&T's efficient use of AT&T's network facilities to terminate Qwest originated traffic, is unpersuasive to have us change our earlier resolution.[8]

Thus, the Commission's decision forces Qwest to share (by paying reciprocal compensation) any costs associated with directing AT&T's local traffic over PLTS, a long distance facility whose rate is set by tariff.  Qwest has appealed the Commission's decision.

## II.     Standard of Review

This court has jurisdiction under 47 U.S.C. § 252(e)(6) to review the Utah commission's arbitration order.  The court applies "a de novo standard when reviewing state commissions' interpretations of the Act and its regulations, as those decisions turn on determinations of federal law."[9]  "Once federal courts determine that state commissions properly interpreted the Act and its regulations, courts apply an arbitrary and capricious standard to review the remaining state commissions' determinations."[10]

## III.    The Commission's Order Violates the Filed-Rate Doctrine.

Qwest argues that the commission's arbitration decisions violate the filed-rate (or filed-tariff) doctrine because they effectively decrease the amount — set by tariff — that AT&T is paying for Qwest's PLTS facility.  The court agrees with Qwest.

---

[8]Reconsideration Order, *supra* note 5, at 7–8.

[9]*Southwestern Bell Tel. Co. v. Apple*, 309 F.3d 713, 717 (10th Cir. 2002).

[10]*Id.*

Qwest, a common carrier under the Act, is subject to 47 U.S.C. § 203(a)'s requirement that "every common carrier [must] file with the FCC 'schedules,' i.e., tariffs, 'showing all charges' and 'showing the classifications, practices, and regulations affecting such charges.'"[11] "[O]nce a carrier's tariff is approved by the FCC, the terms of the federal tariff are considered to be 'the law' and to therefore 'conclusively and exclusively enumerate the rights and liabilities' as between the carrier and the customer."[12]  Qwest has complied with its § 203(a) obligations — it filed its tariff, which the FCC has approved.  The terms of Qwest's tariff are therefore law.

As "law," Qwest's tariff is subject to the filed-rate doctrine.  The United States Supreme Court has made clear that this doctrine "applies to the Communications Act."[13]  Under the filed-rate doctrine, "[n]ot only is a carrier forbidden from charging rates other than as set out in its filed tariff, but customers are also charged with notice of the terms and rates set out in that filed tariff and *may not bring an action against a carrier that would* invalidate, *alter* or add to the terms of the filed tariff."[14]  More specifically, 47 U.S.C. § 203(c) prohibits carriers from "receiv[ing] a greater or less or different compensation" than that specified in its tariff or from "refund[ing] or remit[ting] *by any means or device* any portion of the charges so specified" in the

---

[11]*Am. Tel. & Tel. Co. v. Central Office Tel., Inc.*, 524 U.S. 214, 221 (1998) (quoting 47 U.S.C. § 203(a)).

[12]*Evanns v. AT&T Corp.*, 229 F.3d 837, 840 (9th Cir. 2000).

[13]*Am. Tel. & Tel.*, 524 U.S. at 222.

[14]*Evanns*, 229 F.3d at 840.

tariff.[15]   Succinctly stated, "'the rate of the carrier duly filed [in its tariff] is the only lawful charge.  Deviation from it is not permitted *upon any pretext*.'"[16]

In this case, the Commission's arbitration order must be reversed because it runs afoul of filed-rate doctrine precedent.  Nowhere in either the arbitration order or the order denying Qwest's motion for reconsideration does the Commission discuss the broad sweep of the filed-rate doctrine as interpreted by the United States Supreme Court or the doctrine's impact on its orders.  Instead, the Commission took the view that its order did not implicate this doctrine because the order "did not prevent Qwest from charging AT&T the existing, unaltered, unblended PLTS rate."[17]  The problem with this reasoning, however, is that the filed-rate doctrine is not concerned solely with the whether the full tariff rate is billed, but also with whether there is a related transaction — one ostensibly separate from the initial billing that actually alters the tariff rate.  Here, even if Qwest initally billed AT&T the full tariff rate, a separate bill from AT&T to Qwest for reciprocal compensation on the PLTS line would violate 47 U.S.C. § 203(c)(3) because it would be a "means or device" of refunding or remitting a portion of the PLTS tariff.  Ordering Qwest to pay a separate bill from AT&T for reciprocal compensation also means Qwest will "receive . . . a less or different compensation" than the tariff rate for its PLTS facility in violation of 47 U.S.C. § 203(c)(1).  Any other conclusion would permit carriers to

---

[15]47 U.S.C. § 203(c) (emphasis added).

[16]*Am. Tel. & Tel.*, 524 U.S. at 222 (quoting *Louisville & Nashville R. Co. v. Maxwell*, 237 U.S. 94, 97 (1915)) (emphasis added).

[17]Reconsideration Order, *supra* note 5, at 7–8.

essentially circumvent the approved tariffs by arranging separate deals — precisely what is barred by the Communications Act's prohibition of remitting tariff funds.

In addition, the Commission's order was largely based on the FCC's *TRO* order, which mainly dealt with ILECs placing CLECs at a competitive disadvantage by requiring them to maintain two separate networks — one for long distance and one for local calls. The *TRO* order is not dispositive on the narrow tariff issue presented here. The *TRO* order was concerned with ensuring a CLEC's ability to increase efficiency by routing local calls over any long distance facilities with excess capacity. But Qwest already allows AT&T to do just that — Qwest routes (upon AT&T's request) AT&T's local calls over its long distance PLTS facility. Thus, the inefficiency that the FCC addressed in its *TRO* order simply does not exist here. Rather, this dispute is about *costs*, not *access*. The portion of the FCC's order that the Commission quoted says nothing about sharing costs in these particular circumstances. In contrast, the Act's prohibition on altering tariff rates is clear,[18] as is the Supreme Court's pronouncement that "'[d]eviation from [the filed tariff] is not permitted *upon any pretext*.'"[19]

Because the Commission's order requires Qwest to pay reciprocal compensation for PLTS relative use, it requires Qwest to deviate from its tariff and reduces the amount Qwest collects. This violates the Act and the filed-rate doctrine. The court therefore reverses the Commission's arbitration order to the extent it requires PLTS cost sharing.

---

[18] *See* 47 U.S.C. § 203(c)(1), (3).

[19] *Am. Tel. & Tel.*, 524 U.S. at 222 (quoting *Maxwell*, 237 U.S. at 97) (emphasis added).

The court is fortified in its conclusion by the fact that most public utilities commissions that have reviewed this dispute have sided with Qwest.[20]  Some of these decisions are based on arguments about costs, or the lack thereof, when Qwest routes AT&T local calls over the PLTS facility; as such, they are not directly relevant to the court's reasoning here.  But both the Washington Utilities and Transportation Commission and the Public Service Commission of the State of Nebraska addressed the federal tariff issue and came to the same conclusion as this court. In affirming the Washington arbitrator's decision in favor of Qwest, the Washington Commission said:

---

[20] *Compare In re Petition of Qwest Corp. for Arbitration of Interconnection Rates, Terms, Conditions, and Related Arrangements with AT&T Commc'ns of the Midwest, Inc., and TCG Omaha*, Docket No. C-3095 (Neb. PUC July 27, 2004), *available at* 2004 Neb. PUC LEXIS 117 (finding for Qwest); *In re Arbitration of Qwest Corp. v. AT&T Commc'ns of the Midwest, Inc.*, Docket No. ARB-04-1 (Iowa Utils. Bd. June 17, 2004), *available at* 2004 Iowa PUC LEXIS 289 (same); *In re Qwest Corp.*, Arb. 527, Order No. 04-262 (Or. PUC May 17, 2004), *available at* 2004 WL 1545412 (same); Opinion and Order, *Petition of AT&T Commc'ns of the Mountain States, Inc., and TCG Phoenix, for Arbitration with Qwest Corp., Pursuant to 47 U.S.C. § 252(b)*, Docket Nos. T-02428A-03-0553, T-01041B-03-0553, Decision No. 66888 (Ariz. Corp. Comm'n Apr. 6, 2004) (same); *In re Petition for Arbitration of AT&T Commc'ns of the Pacific Northwest and TCG Seattle with Qwest Corp. Pursuant to 47 U.S.C. § 252(b)*, Docket No. UT-033035, Order No. 05 (Wash. Utils. and Transp. Comm'n Feb. 6, 2004), *available at* 2004 Wash. UTC LEXIS 70 (same); *and* Decision Granting, In Part, Application for Rehearing, Reargument, or Reconsideration, *Petition of Qwest Corp. for Arbitration of an Interconnection Agreement with AT&T Commc'ns of the Mountain States, Inc. and TCG-Colorado Pursuant to 47 U.S.C. § 252(b)*, Docket No. 03B-287T, Decision No. C03-1352 (Colo. PUC Dec. 4, 2003) (same), *with* Arbitration Report and Order, *In re Petition of Qwest Corp. for Arbitration of Interconnection Rates, Terms, Conditions, and Related Arrangements with AT&T Commc'ns of the Mountain States, Inc. and TCG Utah*, Docket No. 04-049-09 (Utah Pub. Serv. Comm'n May 20, 2004) (finding for AT&T), *and* Arbitrator's Report, *Petition of AT&T Commc'ns of the Midwest, Inc. for Arbitration of an Interconnection Agreement with Qwest Corp. Pursuant to 47 U.S.C. § 252(b)*, MPUC Docket No. P442, 421/IC-03-75, OAH Docket No. 12-2500-15429-4 (Minn. PUC Aug. 18, 2003) (same).

> What AT&T proposes, however structured, calls for apportionment and pro rata sharing of costs for PLTS obtained from Qwest under federal tariff.  It is not within our power to make determinations in this arbitration that implicate, and appear to be contrary to, the requirements of a federal tariff that is under the Federal Communications Commission's exclusive jurisdiction.[21]

And the Nebraska Commission's decision upholding the arbitrator's decision in Qwest's favor said that "[w]e find that AT&T's proposed language would result in a modification of Qwest's tariff.  We find that the Arbitrator appropriately found that the Commission is without justification to modify a federal tariff."[22]

It is also worth noting that two federal district courts have reached conflicting conclusions in similar disputes.[23]  One of those is the District of Colorado, which upheld that state's public utilities commission's decision in favor of Qwest.  But the Colorado court's reasoning is inapplicable here.  That court focused on the Colorado Commission's factual finding that AT&T incurred no additional costs when Qwest routed traffic over its PLTS; as such, there were no costs to share.  Though AT&T appealed this decision, no guidance will come from the Tenth

---

[21]*In re Petition for Arbitration of AT&T Commc'ns of the Pacific Northwest and TCG Seattle with Qwest Corp. Pursuant to 47 U.S.C. § 252(b)*, at 15, Docket No. UT-033035, Order No. 05 (Wash. Utils. and Transp. Comm'n Feb. 6, 2004), *available at* 2004 Wash. UTC LEXIS 70.

[22]*In re Petition of Qwest Corp. for Arbitration of Interconnection Rates, Terms, Conditions, and Related Arrangements with AT&T Commc'ns of the Midwest, Inc., and TCG Omaha*, at 2, Docket No. C-3095 (Neb. PUC July 27, 2004), *available at* 2004 Neb. PUC LEXIS 117.

[23] *Compare AT&T Commc'ns of the Mountain States, Inc. v. Qwest Corp.*, No. 04-cv-00532-EWN-OES (D. Colo. June 10, 2005) (upholding arbitrator's decision in favor of Qwest), *with Qwest Corp. v. Minn. Pub. Utils. Comm'n*, No. 04-1164 (JRT/SRN) (D. Minn. Mar. 31, 2005) (upholding arbitrator's decision in favor of AT&T).

Circuit in that case because the parties recently stipulated to dismissal of that appeal with prejudice.[24]

In contrast, the District of Minnesota discussed the filed-rate doctrine when it upheld the Minnesota Commission's decision in favor of AT&T. In a brief discussion, that court called Qwest's contentions "unfounded" and said that

> [o]nce AT&T has leased the private line in accordance with the tariff terms, the line belongs to AT&T and the transaction is complete. The federal tariff rules do not dictate what AT&T does with the line after it is leased from Qwest. The dispute here concerns the terms under which Qwest may use a private line leased by AT&T. Hence, the tariff terms no longer apply.[25]

This reasoning lacks persuasive force in this case. It may well be true that the filed-tariff doctrine does not dictate how AT&T may use its leased PLTS line, but the filed-tariff doctrine *does* control any subsequent conduct that affects the *costs* for the PLTS facility. The Act itself makes this clear. Section 203(c) states that Qwest shall not "refund or remit by any means or device any portion of the charges so specified" in its tariff.[26] A bill from AT&T to Qwest for Qwest's proportionate use of the PLTS facility is precisely that — a "means or device" for refunding or remitting a portion of the tariff charges.

An example may help clarify this issue. Suppose Qwest, as the ILEC in Salt Lake City, leases PLTS facilities to multiple CLECs in Salt Lake — companies such as AT&T or Sprint.

---

[24]*See* Order Granting Stipulation to Dismiss Case, *AT&T Commc'ns of the Mountain States, Inc. v. Qwest Corp.*, No. 05-1367 (10th Cir. Dec. 13, 2005).

[25]Mem. Op. & Order Denying Pl.'s Mot. for Summ. J., at 8–9, *Qwest Corp. v. Minn. Pub. Utils. Comm'n*, No. 04-1164 (JRT/SRN) (D. Minn. Mar. 31, 2005).

[26]47 U.S.C. § 203(c)(2).

The lease price would be that set forth in the tariff and be the same for each CLEC.  But then assume that Qwest and AT&T entered into a side deal and agreed that Qwest would route all of AT&T's local traffic over the PLTS and that AT&T would bill Qwest for each call sent over the PLTS.  The billing structure of this purported separate arrangement would allow the parties to effectively change the tariff rate.  Indeed, Qwest and AT&T, if they so choose, could effectively negate the tariff rate entirely by the simple expedient of raising AT&T's bill to Qwest.  To be clear, no one is suggesting any such subterfuge exists here.  Just the opposite is true; Qwest is fighting the Utah Commission's order that it must pay compensation for PLTS use.  But to uphold the Commission's conclusion would validate such "side deals."  This is directly contrary to Congress's express instructions that refunds and remittances for tariff rates, by any means or device, are strictly prohibited.[27]

Again, the issue is not access to or use of any specific facility by CLECs, but costs associated with tariffed facilities.  AT&T is free to ask Qwest to continue sending local calls over the PLTS facility.  The law, however, forbids AT&T from refunding, remitting, or otherwise reducing or changing the FCC-approved tariff rate that it pays to Qwest for PLTS facilities.  Any changes must instead be made by the FCC.  The Commission's order therefore must be reversed.

### Conclusion

The court GRANTS Qwest's motion for judgment on appeal (# 15) and REVERSES the Utah Commission's decision that Qwest owes a reciprocal compensation obligation for its relative use of AT&T's PLTS facility.  The rate for the PLTS facility is set by tariff, and no

---

[27]*Id.*

portion of the tariff rate may be refunded or remitted "by any means or device,"[28] including a separate bill from AT&T to Qwest for Qwest's relative use of the PLTS service. Therefore, any provision of the parties' interconnection agreement (which stems from the Commission's arbitration order) that requires Qwest to pay reciprocal compensation for the PLTS facility violates federal law and is void. Defendants shall not take any action to enforce such provisions. Nothing in this order affects any other provision of the agreement.

The clerk's office is directed to close the case.

SO ORDERED.

DATED this 28th day of March, 2006.

BY THE COURT:

_____

Paul G. Cassell
United States District Judge

---

[28] 47 U.S.C. § 203(c).